IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

ROBERT R. HULL                                                    PLAINTIFF


        v.                           CIVIL NO. 18-2174


ANDREW M. SAUL,[1] Commissioner
Social Security Administration                              DEFENDANT


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Robert R. Hull, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying his claim for supplemental security income (SSI) benefits under the provisions of Title XVI of the Social Security Act (Act).  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  See 42 U.S.C. § 405(g).

**I.        Procedural Background:**

Plaintiff protectively filed his current application for SSI on January 13, 2016, alleging an inability to work due to insulin dependent diabetes, severe anxiety with agoraphobia, a panic disorder, major depression, bipolar II, left shoulder pain, carpal tunnel bilaterally and a left knee blow out.  (Tr. 74, 189).  An administrative hearing was held on May 2, 2018, at which Plaintiff appeared with counsel and testified. (Tr. 41-72).

---

[1] Andrew M. Saul, has been appointed to serve as Commissioner of Social Security, and is substituted as Defendant, pursuant to Rule  25(d)(1) of the Federal Rules of Civil Procedure.

By written decision dated July 5, 2018, the ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe. (Tr. 17). Specifically, the ALJ found Plaintiff had the following severe impairments: left knee internal derangement, diabetes mellitus (DM), obesity, bilateral shoulder impingement, generalized anxiety disorder, major depressive disorder, panic disorder and a personality disorder with cluster B traits. However, after reviewing all of the evidence presented, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 17). The ALJ found Plaintiff retained the residual functional capacity (RFC) to:

> perform sedentary work as defined in 20 CFR 416.967(a) except occasional climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, or crawling; no overhead reaching bilaterally; and can perform simple, repetitive work, involving incidental personal contact, and requiring direct, concrete, and simple supervision.

(Tr. 19). With the help of a vocational expert, the ALJ determined Plaintiff could perform work as a document preparer, an addresser and a table worker. (Tr. 27).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied that request on August 24, 2018. (Tr. 1-6). Subsequently, Plaintiff filed this action. (Doc. 1). Both parties have filed appeal briefs, and the case is before the undersigned for report and recommendation. (Docs. 11, 12).

The Court has reviewed the entire transcript. The complete set of facts and arguments are presented in the parties' briefs, and are repeated here only to the extent necessary.

2

## II.    Evidence Presented:

At the time of the administrative hearing held before the ALJ on May 2, 2018, Plaintiff was forty-six years of age and had obtained an associate degree. (Tr. 919, 1334). The record reflects Plaintiff's past relevant work consists of work as a coding machine operator and a counter clerk/warehouse worker.  (Tr. 68).

Prior to the relevant time period Plaintiff sought treatment for various impairments including but not limited to depression, anxiety, substance abuse, diabetes mellitus, right shoulder pain, high blood pressure, allergies and back pain.

The pertinent medical evidence for the time period in question reflects the following. On February 8, 2016, Plaintiff was seen by Dr. Von Phomakay for his anxiety, depression and diabetes.  (Tr. 542-544).  Plaintiff was noted as an everyday smoker.  After examining Plaintiff, Dr. Phomakay assessed him with a depressive disorder, and diabetes mellitus.  Dr. Phomakay refilled Plaintiff's medication.  Plaintiff was informed that he would need to find a new primary care physician as the clinic doctors did not see patients on insulin.

On February 18, 2016, Dr. Judith Forte, a non-examining medical consultant, completed a RFC assessment opining that Plaintiff could occasionally lift or carry fifty pounds, frequently lift or carry twenty-five pounds; could stand and/or walk for a total of six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; could push or pull unlimited, other than as shown for lift and/or carry; that Plaintiff could perform no overhead reaching, bilaterally; and that postural, visual, communicative and environmental limitations were not evident.  (Tr. 85-87).

On February 24, 2016, Plaintiff underwent a mental diagnostic evaluation performed by Patricia J. Walz, Ph.D.  (Tr. 545-549).  Dr. Walz noted a previous evaluation conducted

by Robert Spray, Ph.D., on January 2, 2013.  Plaintiff reported he applied for disability because he had panic attacks and a generalized anxiety disorder since an early age.  Plaintiff reported his mood had not been good and he had some suicidal ideation and had been hospitalized for about one week.  Plaintiff explained that he had been in a ministry and did not think he was getting a fair shake.  He wanted to leave the ministry and they were going to drop him off at Walmart so he drank hand sanitizer.  Dr. Walz noted Plaintiff had four psychiatric hospitalizations, the first at the age of thirty-four, but was not under current psychiatric care because he was having trouble finding someone who would take Medicaid.  Plaintiff reported that he lived with his mother who needed constant care.  Plaintiff reported he cooked for his mother and reminded her to take her medication.  Plaintiff reported he did light housekeeping chores and yard work but was limited due to shoulder pain.  Plaintiff reported having problems with concentration.   Dr. Walz opined Plaintiff's intellectual functioning was above average.  Plaintiff was assessed with a generalized anxiety disorder; a panic disorder; major depressive disorder, recurrent moderate; an alcohol use disorder, reportedly in remission; a stimulant use disorder, reportedly in remission; and a personality disorder with cluster B traits.  Dr. Walz noted Plaintiff did not have a driver's license because it was suspended and Plaintiff had not paid the fee.  Plaintiff reported he spent his day watching television, talking to his mother, writing and studying the Bible.  Dr. Walz noted Plaintiff had trouble concentrating due to racing thoughts and that his anxiety interfered with his ability to complete tasks. Plaintiff's speed of information processing was noted as a bit slow.

On February 25, 2016, Dr. Michael Hazlewood, a non-examining medical consultant, completed a Mental RFC Assessment opining that Plaintiff was moderately limited in some

areas of functioning. (Tr. 88-90).  On the same date, Dr. Hazelwood completed a Psychiatric Review Technique form opining that Plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence and pace; and one or two episodes of decompensation, each of an extended duration.  (Tr. 83).  Dr. Hazelwood opined Plaintiff was able to perform simple/repetitive work involving incidental interpersonal contact and direct, concrete and simple supervision (unskilled). On June 13, 2017, after reviewing the records, Dr. Kay M. Gale affirmed Dr. Hazelwood's opinion. (Tr. 113-115).

On April 6, 2016, Plaintiff was seen for a glaucoma evaluation. Plaintiff underwent laser trabeculoplasty of the left eye performed by Dr. Randy Ennen, on April 12, 2016.  (Tr. 565-566, 900-902).  By May 16, 2016, Plaintiff reported he was doing well.  (Tr. 899).

On April 7, 2016, Plaintiff was seen at Valley Behavioral Health for a diagnostic evaluation.  (Tr. 551-555).  Plaintiff's symptoms consisted of a low mood, anhedonia, low energy, panic attacks and grief.  Susan Smith, MS, LPC, NCC, noted Plaintiff was referred by his primary care physician.   Ms. Smith noted Plaintiff's primary problems were depression, anxiety and panic attacks. Plaintiff was assessed with major depressive disorder recurrent moderate and a generalized anxiety disorder.  It was recommended that Plaintiff start individual therapy along with medication management.

On April 27, 2016, Plaintiff was seen for an initial outpatient psychiatric evaluation. (Tr. 917-922).  Plaintiff was being seen for medication refills.  Plaintiff reported that his anxiety had worsened since his mother had been sick.  Plaintiff reported his medication had

been working well. Plaintiff was noted to have no functional limitations. Plaintiff was assessed with depression and anxiety and prescribed medication.

On May 11, 2016, Plaintiff was seen by Ms. Smith for individual therapy. (Tr. 620). Plaintiff reported increased medical problems that complicated his depression. Ms. Smith noted Plaintiff had several infected teeth, as well as shoulder and knee pain. Plaintiff reported he was reluctant to use pain medication out of fear of abuse. Ms. Smith recommended Plaintiff discuss the concerns with his primary care physician. Plaintiff reported he would try the relaxation exercises to help his mind. Plaintiff was to return in two weeks.

On May 19, 2016, Plaintiff underwent a MRI of the left knee that revealed a complete ACL rupture. (Tr. 569-609).

On June 6, 2016, Plaintiff was seen by Dr. Dale Wayne Asbury for a medication refill and a psychiatry referral. (Tr. 635-639). Upon examination, Dr. Asbury noted Plaintiff ambulated normally, had good judgment and a normal mood, affect and memory. Dr. Asbury assessed Plaintiff with anxiety, diabetes mellitus and pain and prescribed medication.

A progress note dated June 17, 2016, revealed Plaintiff had been out of his medication for two weeks. (Tr. 615, 916). Plaintiff was noted to be living with his mother and step-dad. Plaintiff reported he helped his mother who was ill. Plaintiff reported being nervous about his mother being sick. Plaintiff's medication was adjusted and he was to return in three months for a follow-up.

On June 23, 2016, Plaintiff was seen by Ms. Smith for individual therapy. (Tr. 618). Ms. Smith noted Plaintiff continued to struggle with health problems that impacted his mood

and anxiety level.  Plaintiff had teeth pulled and his arthritis was flaring up.  Plaintiff also reported that his mother was in the hospital.  Plaintiff agreed to focus on himself while his mother was in the hospital.  Plaintiff was to follow-up in two weeks.

On July 21, 2016, Plaintiff was seen by Ms. Smith for individual therapy.  (Tr. 617). Plaintiff reported his anxiety had increased for unknown reasons. Plaintiff's stressors included his mother being home from the hospital and his brother and father not doing well. Plaintiff reported he spent his time working around the house.  Ms. Smith discussed the stress of being a caregiver for a parent and watching a  parent's health decline.  Plaintiff was to follow-up in two weeks.

A progress note dated July 26, 2016, indicated Plaintiff was seen by Kellie Berry-Hert, APN, for a follow-up for his depression and anxiety.  (Tr. 614, 915). Plaintiff reported his anxiety "was through the roof."  Plaintiff's medication was adjusted and he was to return in two months.

On August 8, 2016, Plaintiff was seen by Ms. Smith for individual therapy.  (Tr. 616). Plaintiff reported his anxiety continued to worsen.  Plaintiff thought his medication change actually made his symptoms worse not better.  Plaintiff reported he spent his time at home working around the house and yard.  Plaintiff reported he had not been able to work on his relaxation exercises due to not having a computer or phone.  Ms. Smith provided handouts for the exercises.  Plaintiff was to return in two weeks for a follow-up appointment.

On August 15, 2016, Plaintiff was seen by Dr. Asbury for a diabetes follow-up and medication refills.  (Tr. 633-635).  Upon examination, Dr. Asbury noted Plaintiff ambulated normally.  Plaintiff was assessed with anxiety and prescribed medication.

On September 23, 2016, Plaintiff was seen by Nurse Berry-Hert. (Tr. 914-). Nurse Berry-Hert noted Plaintiff had situational depression. Plaintiff reported that Klonopin was not helpful and requested that he be started back on Ativan. Plaintiff reported that his "meds are working." Plaintiff's medication was changed and he was to return in three months.

On November 10, 2016, Plaintiff was seen by Dr. Asbury for medication refills. (Tr. 629-633). Upon examination, Dr. Asbury noted Plaintiff ambulated normally, had good judgment and a normal mood, affect and memory. Plaintiff was found to have normal muscle strength and tone. Plaintiff had normal movement in all four extremities. Dr. Asbury assessed Plaintiff with anxiety, diabetes mellitus, a meniscus tear of the knee and a ruptured ACL of the left knee. Plaintiff was prescribed medication and referred to an orthopedic doctor.

On December 30, 2016, Plaintiff was seen by Dr. Asbury for a one-month follow-up and mediation refill. (Tr. 626-629). Upon examination, Dr. Asbury noted Plaintiff ambulated normally, had good judgment and a normal mood, affect and memory. Plaintiff was found to have normal muscle strength and tone. Plaintiff had normal movement in all four extremities. Dr. Asbury assessed Plaintiff with anxiety and diabetes mellitus.

On January 27, 2017, Plaintiff was seen by Dr. Asbury for a cough and a two-month follow-up appointment. (Tr. 623-626). Upon examination, Dr. Asbury noted Plaintiff ambulated normally. Plaintiff was noted to have good judgment and a normal mood and affect. After examining Plaintiff, Dr. Asbury assessed Plaintiff with a ruptured ACL of the left knee and diabetes mellitus.

On January 27, 2017, Dr. Asbury also completed a Medical Source Statement opining Plaintiff could lift and carry ten pounds frequently, and twenty five pounds occasionally; could stand and walk three hours out of an eight-hour day; could sit for eight hours out of an eight-hour day; could push and/or pull unlimited; would need four or more breaks in an eight-hour day; and could perform five hours of work activities in an eight-hour day. (Tr. 621-622). Dr. Asbury opined Plaintiff could climb, balance, squat, kneel, crouch and stoop less than two hours in an eight-hour day. Dr. Asbury opined Plaintiff could reach in all directions, handle, finger, grip and feel six hours out of an eight-hour workday. Plaintiff was also noted to have environmental limitations. Dr. Asbury noted the limitations were not supported by objective findings.

On January 30, 2017, Plaintiff was seen by Layne McLain, PA, for left knee pain. (Tr. 645-646). Plaintiff reported that his knee was becoming increasingly unstable. Mr. McLain noted Plaintiff's blood pressure was dangerously high and that Plaintiff reported it was "normal" for him. Plaintiff indicated Dr. Asbury had been attempting to control his blood pressure. Plaintiff's knee exam was consistent with a chronic anterior cruciate ligament tear. It was recommended that Plaintiff undergo a MRI before making a decision on treatment.

On February 10, 2017, Plaintiff underwent a MRI of the left knee that revealed a chronically torn anterior cruciate ligament, a possible vertical tear far peripherally in the posterior horn of the medial meniscus and a probable small incidental enchondroma proximal tibia. (Tr. 643-644).

On February 15, 2017, Plaintiff was seen by Dr. Greg T. Jones for his left knee pain. (Tr. 646-648, 746-747).   After examining Plaintiff and the MRI, Dr. Jones recommended surgical repair of the left knee.

On February 16, 2017, Plaintiff was seen by Nurse Berry-Hert.   (Tr. 913).   Nurse Berry-Hert noted Plaintiff changed his mind about going back on Xanax.   Plaintiff reported he was feeling "ok" but was stressed with waiting for surgery on his knee.   Plaintiff reported he was still taking care of his mother who had fallen and broken her hip.   Plaintiff's mood was noted as "fair" as he only had a break from his mom at times.   Plaintiff did not want a medication change.   Plaintiff was to return in three months.

On February 20, 2017, Plaintiff was seen my Mr. McLain for a follow-up for the left knee.   (Tr. 648).   Mr. McLain recommended Plaintiff see Nurse Janice Bishop to help bring his diabetes under control.

On February 28, 2017, Plaintiff was seen by Janis P. Bishop CRNP, to establish care for Plaintiff's diabetes.   (Tr. 655-660, 836-842).   Plaintiff reported after the death of his wife, who died from complications of diabetes, he quit checking his glucose but kept taking his medication. Nurse Bishop discussed a plan with Plaintiff to start checking his glucose more regularly.   Upon examination of Plaintiff, Nurse Bishop noted Plaintiff had mild distress/anxiety.   Plaintiff's back was symmetric and without curvature.   Plaintiff extremities were noted as normal and without edema.   Plaintiff was assessed with diabetes mellitus and mixed hyperlipidemia.   Nurse Bishop adjusted Plaintiff's medication and asked him to return in two weeks.

On March 9, 2017, Ms. Smith opined that Plaintiff's Global Assessment of Functioning (GAF) score fell into the 50-41, serious symptom range. (Tr. 667-668).

On March 14, 2017. Plaintiff was seen by Nurse Bishop for a follow-up for his diabetes, and was given clearance to proceed with left knee surgery (Tr. 730-734, 797-801). Upon examination of Plaintiff, Nurse Bishop noted Plaintiff appeared alert, cooperative and in no distress. Plaintiff' s back was symmetric and his extremities were normal. Plaintiff was to return in four weeks.

On March 24, 2017, Plaintiff underwent surgical repair of the left knee performed by Dr. Jones. (Tr. 726-730, 748, 853-856).

On March 27, 2017, Plaintiff was seen by Mr. Daniel R. Curtis for physical therapy following left knee surgery. (Tr. 722-726). Plaintiff reported he fell after surgery at home but he thought his left knee was fine. Plaintiff was instructed on use of a single crutch.

On April 3, 2017, Plaintiff was seen by Mr. McLain for a postoperative appointment after left knee surgery. (Tr. 72-, 856-857). Plaintiff was noted as full weight bearing and doing well. Plaintiff's sutures were removed and he was to continue home therapy.

On April 5, 2017, Plaintiff was seen by Mr. James A. Honey for physical therapy for his left knee. (Tr. 718-720). Therapy notes indicated Plaintiff's sutures were removed on April 3, 2017, and that Plaintiff independently progressed to a cane a few days ago. Plaintiff denied significant pain increase or complication.

On April 12, 2017, Plaintiff was seen by Nurse Bishop for a follow-up appointment for his diabetes and a knee laceration following surgery. (Tr. 715-718, 801-806). Plaintiff was examined and assessed with diabetes and a knee laceration.

On April 18, 2017, Plaintiff was seen for an annual psychiatric evaluation at Valley Behavioral Health System. (Tr. 678-681, 907-912). Plaintiff reported stress caused by being the caretaker of both of his parents. Plaintiff reported racing thoughts that made it difficult to sleep. Plaintiff requested an increase in the dosage of his Ativan. Plaintiff was assessed with depression, anxiety and insomnia. Plaintiff was to continue outpatient therapy and medication management.

On April 19, 2017, Plaintiff underwent physical therapy for his left knee performed by Mr. Honey. (Tr. 712-714). Plaintiff requested a knee brace. Plaintiff explained that when he went into town, he would ride with his brother who also brought their dad for dialysis. When their dad was at dialysis, Plaintiff reported he and his brother would walk around stores. Plaintiff also reported that due to transportation and finances he could only come to therapy once a week.

On April 25, 2017, Ms. Samantha Pryor, LCSW, opined that Plaintiff's Global Assessment of Functioning (GAF) score fell into the 50-41, serious symptom range. (Tr. 902-903).

In a letter dated April 28, 2017, Ms. Pryor, stated Plaintiff was receiving therapeutic services as a result of symptoms that interfered with his ability to maintain employment. (Tr. 904).

On May 3, 2017, Plaintiff was seen by Dr. Jones for a follow-up after his knee surgery. (Tr. 709-710, 857-858). Dr. Jones noted Plaintiff had a pretty decent stability return. Dr. Jones noted Plaintiff had a fall after the surgery but it did not appear to have caused further damage. X-rays of the left knee revealed excellent alignment. Plaintiff was to undergo out-patient therapy once a week for six weeks. Dr. Jones noted Plaintiff was having to run a lot of errands and perform other activity requiring restricted functionality so he recommended a knee brace.

On May 8, 2017, Plaintiff was seen by Nurse Bishop for cloudy urine. (Tr. 705-709, 806-812, 842-850). Plaintiff reported his urine looked foamy. Nurse Bishop noted this was significant as Plaintiff had a history of alcoholism. Plaintiff was examined and asked to return in six weeks.

On May 10, 2017, Plaintiff had physical therapy for his left knee with Mr. Curtis. (Tr. 702-704). Plaintiff was fitted for a knee brace after therapy.

On May 17, 2017, Plaintiff had physical therapy for his left knee with Ms. Lisa D. Hodges. (Tr. 700-702). Plaintiff was noted to be about seven weeks post-op. Plaintiff tolerated treatment well but was visibly fatigued after therapy. Plaintiff was to return in two weeks.

On May 23, 2017, Plaintiff was seen by Nurse Bishop complaining of foot pain. (Tr. 696-699, 812-818). Plaintiff underwent a foot exam for a new pair of diabetic footwear.

On May 31, 2017, Plaintiff underwent physical therapy for his left knee with Mr. Curtis. (Tr. 693-695). Mr. Curtis noted Plaintiff indicated he had a knee brace but Plaintiff did not wear the brace to therapy. Plaintiff mentioned he might join a local fitness club.

On June 5, 2017, Plaintiff had a follow-up appointment with Nurse Bishop. (Tr. 688-693, 818-827). Nurse Bishop noted an ultrasound revealed Plaintiff had chronic cholecystitis with gallstones. Plaintiff was referred for physical therapy for his right upper limb.

On June 12, 2017, Plaintiff was seen by Nurse Berry-Hert (Tr. 906). Plaintiff reported he was very stressed out with his living situation. Plaintiff was living with his brother who was an alcoholic. Plaintiff reported he was dealing with a lot of anger. Plaintiff's medications were kept the same. Plaintiff was to return in three months.

On June 13, 2017, Plaintiff was transported to the emergency room of Mercy Hospital Fort Smith, complaining of alcohol intoxication. (Tr. 685-688). Upon examination, Plaintiff was found to have a normal range of motion of the neck, normal breath sounds, normal range of motion of the spine and extremities with no edema or tenderness and a normal mood and affect. Plaintiff smelled of alcohol but answered questions appropriately. Plaintiff reported that his brother made him come to the emergency room but he now felt fine. Plaintiff reported he did not want any testing and wanted to go home. Plaintiff was discharged home in stable condition and was noted to ambulate with a steady gait.

On June 16, 2017, Plaintiff was admitted into Valley Behavioral Health System. (Tr. 788-796). Plaintiff complained of anxiety and depression. Plaintiff reported suicidal ideation. Plaintiff reported his brother and grandmother were taking care of his Dad, who was on dialysis. Plaintiff reported having arguments with his brother, whom he labeled an alcoholic. Plaintiff reported that he was a recovering alcoholic and it had become increasingly difficult to maintain sobriety. Plaintiff reported having thoughts of wanting to hurt his brother. Plaintiff responded well to treatment and was discharged on June 30, 2017.

14

Upon discharge, Plaintiff was noted to be able to perform activities of daily living independently.  It was recommended that Plaintiff follow-up with care on July 27, 2017.

On July 7, 2017, Dr. Lucy Sauer, a non-examining medical consultant, completed a RFC assessment opining that Plaintiff could occasionally lift or carry ten pounds, frequently lift or carry less than ten pounds; could stand and/or walk for a total of two hours in an eight-hour workday; could sit about six hours in an eight-hour workday; could push or pull unlimited, other than as shown for lift and/or carry; that Plaintiff could perform no overhead reaching, bilaterally; could occasionally climb ramps/stairs, balance, stoop, kneel, crouch and crawl but never climb ladders/ropes/scaffolds; and that, visual, communicative and environmental limitations were not evident.  (Tr. 110-112).

On July 26, 2017, Plaintiff was seen by Nurse Berry-Hert.  (Tr. 905).  Plaintiff reported he moved out of the home with his brother due to his brother's drinking.  Plaintiff reported his medications were working well and that he was sleeping well.  Plaintiff was to return in three months.

On August 2, 2017, Plaintiff had a follow-up appointment with Nurse Bishop for his diabetes.  (Tr. 827-835). Nurse Bishop noted Plaintiff went to the emergency room in June, with alcohol intoxication and then up to Valley Behavioral Health for counseling.  Plaintiff also reported chronic pain in both shoulders.  Upon examination of Plaintiff, Nurse Bishop noted tenderness in the lower cervical and mid-thoracic spine.  Plaintiff also exhibited bilateral shoulder pain with decreased range of motion, right greater than left.  Plaintiff was asked to return in six weeks.

On August 16, 2017, Plaintiff was seen by Mr. McLain for a follow-up on his ACL reconstruction.  (Tr. 858-859).  Plaintiff did not have an appointment but was seen because the Medicaid bus had dropped him off.  Upon examination, Plaintiff was noted to have good endpoint with the left anterior drawer test.  Plaintiff had a large abrasion on his knee and reported he had to jump out of the way so that a car did not hit him near his home.  Mr. McLain noted the abrasion appeared to be healing.  Mr. McLain noted that he feared Plaintiff had come to the office to ask for pain medication.  Plaintiff asked for pain medication on three separate occasions during the visit. Mr. McLain told Plaintiff he was almost six months out from surgery and should not need pain medication.  Plaintiff was told if he continued to have shoulder problems, he would need a separate appointment.

On August 23, 2017, Plaintiff was seen for right upper quadrant pain with gallstones. (Tr. 861-865).  After reviewing an ultrasound, Dr. Jonathan P. Ferrari recommended the removal of the gall bladder.

On August 29, 2017, Plaintiff underwent x-rays of the cervical spine that revealed straightening that may have been related to positioning or spasm with some slight degenerative endplate changes.  (Tr. 972-979).  X-rays of the thoracic spine revealed exaggerated thoracic kyphosis with the mild lower thoracic discogenic degeneration.  X-rays of Plaintiff's shoulders revealed mild bilateral degenerative arthropathy of the acromioclavicular joints.

On October 9, 2017, Plaintiff was seen by Nurse Bishop for a follow-up appointment. (Tr. 966-972).  Plaintiff reported he had been admitted into Valley Behavioral Health for two

16

weeks because he wanted to hurt his brother-in-law. Plaintiff was examined and medication was adjusted. Plaintiff was to return in six weeks.

On January 17, 2018, Plaintiff was seen by Brad Walker, LAC, for an initial assessment at The Guidance Center for medication management. (Tr. 1341-1348, 1418-1419). Plaintiff reported he had started drinking again but not "too bad." Plaintiff's primary complaint was panic and anxiety. Plaintiff was to continue with individual therapy and medication management.

On January 18, 2018, Plaintiff participated in his initial master treatment plan at The Guidance Center. (Tr. 1337-1340, 1414-1417). Plaintiff's strengths were listed as attends to activities of daily living, asks for help and is able to work/attend school.

On January 25, 2018, Plaintiff was seen by Dr. Asbury for a check-up and medication refill. (Tr. 1385-1390). Plaintiff complained of pain that radiated into his buttocks, a cough and diabetes. After examining Plaintiff, Dr. Asbury assessed Plaintiff with chronic back pain, a cough, and diabetes mellitus.

On February 8, 2018, Plaintiff was seen by Dr. Asbury. (Tr. 1381-1385). After examining Plaintiff, Dr. Asbury assessed Plaintiff with left rotator cuff syndrome, pain in the left knee and a hypertensive disorder.

On February 9, 2018, Plaintiff underwent x-rays of the left knee that revealed post-surgical change of the left knee with no acute osseous abnormality. (Tr. 1349).

On February 16, 2018, Plaintiff entered the emergency room complaining of a cough for one month. (Tr. 1350-1352). A chest x-ray revealed no acute cardiopulmonary disease. Plaintiff was assessed with bronchitis and prescribed medication.

On February 18, 2018, Plaintiff was seen at The Guidance Center. (Tr. 1333-1337, 1410-1413). Plaintiff was noted as relatively stable. Plaintiff reported he had been sober for about six years. Plaintiff reported experiencing panic attacks about twice a week. Plaintiff reported he had been in patient twice, most recently in July of 2017, when he was homicidal toward his brother who continued to drink. Plaintiff report his last outpatient provider was Valley Behavioral about two years ago. Plaintiff reported he was living in a homeless shelter because living with his mother and brother was too difficult due to his brother's continued use of alcohol. Plaintiff was to continue his medication and to follow up in three months.

On February 21, 2018, Plaintiff entered the emergency room complaining of respiratory distress and was admitted. (Tr. 1353-1367, 1392-1395). Plaintiff responded well to treatment and was discharged on February 28th, and noted as markedly improved. It was recommended that Plaintiff stop smoking.

On March 22, 2018, Plaintiff was seen by Dr. Asbury. (Tr. 1377-1381). Plaintiff complained of shortness of breath and shoulder pain. After examining Plaintiff, Dr. Asbury assessed Plaintiff with moderate obstructive pulmonary disease and bilateral disorder of the rotator cuff. Plaintiff was strongly advised to stop smoking. Plaintiff was given an orthopedic referral.

On March 27, 2018, Plaintiff underwent chest x-rays that revealed an old compression of T-spine with increased kyphosis and no acute cardiopulmonary process. (Tr. 1391).

On April 5, 2018, Plaintiff was seen by Dr. Asbury. (Tr. 1373-1377). Upon examination, Plaintiff was found to have full range of motion in his neck. Plaintiff was noted to have a normal mood and affect with normal memory. Plaintiff exhibited a normal gait and balance. Plaintiff was assessed with low back pain.

On April 5, 2018, Dr. Asbury also completed a physical residual functional capacity assessment opining Plaintiff could not sit for six hours in an eight-hour workday; could not sit/stand/walk in combination for eight hours in an eight-hour workday; required four or more unscheduled work breaks in an eight-hour workday due to physical restrictions; and had significant limitations in the ability to reach/push/pull bilaterally in the upper extremities. (Tr. 1364-1373).

On April 10, 2018, Mr. Walker completed a Mental Residual Functional Capacity Assessment opining Plaintiff had no useful ability to function on a sustained basis in thirteen of twenty-three areas of functioning. (Tr. 1425).

On April 16, 2018, Plaintiff was seen at The Guidance Center. (Tr. 1406-1410). Plaintiff reported he had been in rehab. Plaintiff reported he was doing well. Plaintiff reported experiencing some depression and requested to start Lexapro. Plaintiff was noted to have intact judgment and normal attention and concentration.

On May 4, 2018, Plaintiff participated in a treatment plan review at The Guidance Center. (Tr. 1402-1405). Plaintiff's strengths included the ability to attend activities of daily

19

living, ask for help, to learn and to care for others despite own problems.  Plaintiff was noted to have had a relapse on alcohol recently that led to a residential treatment episode.  It was noted that Plaintiff could benefit from out-patient therapy.

## III.    Applicable Law:

The Court reviews "the ALJ's decision to deny disability insurance benefits de novo on the record to ensure that there was no legal error and that the findings of fact are supported by substantial evidence on the record as a whole." Combs v. Berryhill, 878 F.3d 642, 645-46 (8th Cir. 2017).  "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support a conclusion." Id.  The Court considers "the record as a whole, reviewing both the evidence that supports the ALJ's decision and the evidence that detracts from it." Id.  The Court will not reverse an administrative decision simply because some evidence may support the opposite conclusion. Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. Id.

It is well established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.2001); see also 42 U.S.C. § 423(d)(1)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42

20

U.S.C. § 423(d)(3). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. See 20 C.F.R. § 416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity. See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982), abrogated on other grounds by Higgins v. Apfel, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. § 416.920.

## IV.  Discussion:

Plaintiff argues the following issue on appeal: 1) the ALJ failed to fully and fairly develop the record; 2) the ALJ erred at Step Two of the sequential analysis, both physical and mental, including performance of the PRT; 3) the ALJ erred in the Polaski analysis; and 4) the ALJ erred in determining the RFC which was not supported by either examining or treating source opinion evidence.

### A.  Full and Fair Development of the Record:

The ALJ has a duty to fully and fairly develop the record. See Frankl v. Shalala, 47 F.3d 935, 938 (8th Cir.1995). The ALJ's duty to fully and fairly develop the record is independent of Plaintiff's burden to press her case. Vossen v. Astrue, 612 F.3d 1011, 1016

(8th Cir. 2010). The ALJ, however, is not required to function as Plaintiff's substitute counsel, but only to develop a reasonably complete record. "Reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial." Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995). "While an ALJ does have a duty to develop the record, this duty is not never-ending and an ALJ is not required to disprove every possible impairment." McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011).

In this case, the record consists of a consultative mental diagnostic evaluation; assessments completed by both mental and physical medical consultants; medical assessments from Plaintiff's treating physician; a mental medical assessment from Plaintiff's counselor; and medical records dated both prior to and during the relevant time period. While Plaintiff argues the need for consultative evaluations, a consultative evaluation is not required to assess Plaintiff's capabilities. See Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir.2007)(the medical evidence, State agency physician opinions, and claimant's own testimony were sufficient to assess residual functional capacity); Stormo v. Barnhart, 377 F.3d 801, 807–08 (8th Cir.2004)(medical evidence, State agency physicians' assessments, and claimant's reported activities of daily living supported residual functional capacity assessment). "The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." Halverson v. Astrue, 600 F.3d 922, 933 (8th Cir.2010) (quoting Barrett v. Shalala, 38 F.3d 1019 (8th Cir.1994)).

After reviewing the entire record, the Court finds the record before the ALJ contained the evidence required to make a full and informed decision regarding Plaintiff's capabilities

during the relevant time period.  Accordingly, the undersigned finds the ALJ fully and fairly developed the record.

### B.    Plaintiff's Impairments:

At Step Two of the sequential analysis, the ALJ is required to determine whether a claimant's impairments are severe. See 20 C .F.R. § 404.1520(c).  While "severity is not an onerous requirement for the claimant to meet…it is also not a toothless standard." Wright v. Colvin, 789 F.3d 847, 855 (8th Cir. 2015) (citations omitted).  To be severe, an impairment only needs to have more than a minimal impact on a claimant's ability to perform work-related activities. See Social Security Ruling 96-3p.  The claimant has the burden of proof of showing he suffers from a medically-severe impairment at Step Two.   See Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir.2000).

Plaintiff argues that the ALJ failed to properly utilize the special technique when he evaluated Plaintiff's alleged mental impairments.  The regulation requires the ALJ to consider Plaintiff's degree of limitation in four areas of functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentration, persistence, or pace; and (4) adapting or managing oneself.  20 C.F.R. § 416.920a.  The ALJ determined Plaintiff had mild limitations with understanding, remembering or applying information; moderate limitation in interacting with others; moderate limitation with concentration, persistence, or pace; and moderate limitation with adapting or managing oneself.  (Tr. 18).

The Court finds the ALJ did not commit reversible error in setting forth Plaintiff's severe impairments during the relevant time period.

C.    **Subjective Complaints and Credibility Analysis:**

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions.  See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole.  Id.  As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  Edwards, 314 F.3d at 966.

After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints, including the Polaski factors.   A review of the record revealed that during the relevant time period could take care of his personal hygiene slowly; could prepare simple meals; and could shop in stores.  (Tr. 253-260).  The record further revealed that Plaintiff discussed increased anxiety due to his being the caretaker for his parents.  Specifically, in February of 2016, Plaintiff reported to Dr. Walz that he lived with his mother who needed constant care.   While Plaintiff reported concentration problems and shoulder pain, he indicated to Dr. Walz that he performed light housekeeping chores and yard work.  In April of 2017, Plaintiff again noted the increased stress caused by being a caretaker for older parents.

With respect to Plaintiff's alleged impairments, the record revealed that Plaintiff responded well to treatment and medication. Brace v. Astrue, 578 F.3d 882, 885 (8th Cir.

2009) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.")(citations omitted).

Therefore, although it is clear that Plaintiff suffers with some degree of limitation, he has not established that he was unable to engage in any gainful activity during the time period in question. Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

### D.    The ALJ's RFC Determination and Medical Opinions:

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. Id. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

In determining that Plaintiff maintained the RFC to perform sedentary work with limitations, the ALJ considered the medical assessments of the treating medical doctor, counselors and the non-examining agency medical consultants; Plaintiff's subjective

complaints; and his medical records.  The Court notes that in determining Plaintiff's RFC, the ALJ discussed the medical opinions of the treating, examining and non-examining medical professionals, and set forth the reasons for the weight given to the opinions. Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) ("It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians")(citations omitted); Prosch v. Apfel, 201 F.3d 1010 at 1012 (the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole).  The ALJ also took Plaintiff's obesity into account when determining that Plaintiff could perform sedentary work.  Heino v. Astrue, 578 F.3d 873, 881-882 (8th Cir. 2009) (when an ALJ references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal).  Based on the record as a whole, the Court finds substantial evidence to support the ALJ's RFC determination for the relevant time period.

### E.    Hypothetical Question to the Vocational Expert:

After thoroughly reviewing the hearing transcript along with the entire evidence of record, the Court finds that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005).  Accordingly, the Court finds that the vocational expert's opinion constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude him from performing work as a document preparer, an addresser and a table worker.  Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996) (testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

**V.     Conclusion:**

Based on the foregoing, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice.  **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 30th day of  September 2019.


/s/  *Erin L. Wiedemann*
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE